Hutchinson *v.* Board of Health of the City of Trenton.

MAHLON HUTCHINSON et al., appellants,

*v.*

THE STATE, EX REL. THE BOARD OF HEALTH OF THE CITY OF TRENTON, respondent.

1. No power exists in the common council of Trenton, under its charter, to license an individual to lay a private sewer in public streets or to discharge filth into an open watercourse not a public sewer. One who thus uses a private sewer laid under permission of an ordinance of the council, cannot claim to be exempted from proceedings to abate or restrain a public nuisance created thereby, on the ground that such use is an act authorized to be done by public authority.

2. A board of health organized under the "Act concerning the protection of the public health, and the record of vital facts and statistics relating thereto," approved March 11th, 1880 (*P. L. of 1880 p. 206*), may file a bill in the court of chancery as relators, in the name of the state, for an injunction to restrain the continuance of any nuisance hazardous to the public health of the locality. In this respect the remedy to restrain such a nuisance, which formerly was required to be in the name and at the instance of the attorney-general, has been extended so that a proceeding in equity for an injunction may be taken by such a board.

On appeal from decree made on the advice of Vice-Chancellor Bird, whose opinion is reported in *Trenton Board of Health* v. *Hutchinson, 12 Stew. Eq. 218.*

*Mr. W. M. Lanning* and *Mr. B. Gummere*, for appellants.

*Mr. James Buchanan* and *Mr. G. D. W. Vroom*, for respondent.

The opinion of the court was delivered by

MAGIE, J.

The bill in this case was filed in the name of the state, on the relation of the board of health of the city of Trenton. It charged the appellants (one of whom was the owner and the other the occupant of a hotel in Trenton) with causing and maintaining a

public nuisance injurious to the health of the inhabitants of that city, by discharging into Petty's run, through a pipe or sewer laid in West Hanover street, filth and offensive matter from the sinks and water-closets of the hotel. It sought an injunction against the continuance of the nuisance.

Appellants, by their answer, denied that the discharge from the hotel caused the nuisance complained of, and insisted that they had acquired a right to lay and maintain the sewer, which right was such as to bar any proceeding against them for a public nuisance. They further denied the right of relators to file this bill in the name of the state, and asked that they might have the same benefit of the objection thus raised as if they had demurred to the bill.

The cause came to hearing before Vice-Chancellor Bird, and on his advice a decree was made perpetually enjoining appellants from discharging into Petty's run, through the pipe, the filth and offensive matters from the hotel.

The proofs taken below afford, in my judgment, ample justification for the conclusion there reached that the discharge complained of was a public nuisance, hazardous to the public health.

Nor can I find any ground to dissent from the conclusion of the learned vice-chancellor, which denied to appellants the protection they claimed against proceedings to abate or enjoin the nuisance.

Their contention was (and it has also been urged in this court) that they had acquired a right to maintain this sewer and to empty the waste of the hotel into Petty's run, by the act of the public authorities of the city of Trenton, and that while exercising the right so acquired they were shielded from indictment, injunction or other proceeding founded on the ground that the permitted act caused a public nuisance.

The pipe was laid by Edmund Bartlett, then owner of the hotel. Just before it was laid, the common council of Trenton had passed an ordinance giving Bartlett power to lay a ten-inch drain-pipe or sewer from the hotel through West Hanover street to Petty's run. The ordinance provided that the pipe or sewer was to be constructed so as to prevent its becoming a nuisance,

and that if it should become a nuisance or injurious or dangerous to the public, on which the opinion of the common council was to be final or conclusive, then it was to be removed by Bartlett, and if he failed to remove it, by the council at his expense.

The ordinance was accepted by Bartlett, as required by its terms, and he laid the pipe and used it, as appellants have since done, under such authority as was acquired by and under this ordinance.

At the time this ordinance passed, the common council had power to cause sewers to be constructed in any part of the city, when, in their judgment, the public good required, and to assess the cost of such sewers on property benefited. *P. L. of 1874* § *25 pl. VIII.,* § *76 pl. II.*

The ordinance did not expressly permit the pipe when laid to be used to carry off offensive matters. When it is understood that the point of discharge at Petty's run is in a thickly-settled part of the city, and that the run (which is a natural watercourse) traverses a thickly-settled region before it empties into the Delaware, and when it is noted with what care the ordinance requires it to be constructed and used so as not to become a nuisance, some ground is afforded for the argument urged on our attention, that it was never intended to authorize its use to discharge what might reasonably be expected to create a nuisance. But I think the language used in the ordinance requires us to consider it a grant of whatever power the council could thus grant, to use the pipe in the mode sewers are ordinarily used.

In the case of *Hunt* v. *Lambertville, 16 Vr. 279,* power granted to a municipal corporation to lay public sewers at public expense, was held to include by implication a power to permit such sewers to be built at private expense. But the case differed from the case in hand. The sewer in that case, though built at private expense, was to become a public sewer. It was to be used not only by those who built it but by others. In this case the sewer was to be used only by the party building it, and was plainly to remain his private property.

Under the authority to lay sewers for the public good and at the public expense, I am unable to discover authority, by grant

or license, to permit the use of the public streets for a private sewer.

It is not the case of a connection with a public sewer. Petty's run was not such a sewer, but an open, or partially open, water-course. Connections with public sewers are necessary incidents to their use, and the power to permit them to be laid is implied from the power to lay the sewers.

Nor has my examination of the Trenton charter enabled me to find any grant of power broad enough to justify a grant or license to an individual to occupy public streets with private sewers. Beside the authority to lay public sewers, there is nothing giving more extensive rights in the streets than the charter considered by Chancellor Zabriskie in *Glasby* v. *Morris, 3 C. E. Gr. 72,* and held not to justify a license to maintain a private sewer in a public street.

My conclusion is that there was no authority in council to pass this ordinance permitting this private sewer to be laid and its contents discharged into Petty's run.

It is urged that the court ought not to examine the authority of council to pass such an ordinance, but appellants invoke the ordinance as a protection, and it is necessary to determine its legality and sufficiency.

The conclusion thus arrived at disposes of this contention on the part of appellants, for it is only when the act which has caused a nuisance has been done by virtue of authority derived from the supreme legislative power, that the public, which has granted the authority, is estopped from pursuing the actor by remedial or primitive proceedings for the resulting public injury.

Although I put my conclusion on the ground above stated, I do not wish to be understood as implying that if council had authority to permit appellants to discharge the filth of this hotel through the public streets, the result would necessarily be favorable to them.

When exemption from proceedings as for a public nuisance is claimed, on the ground that the nuisance was the result of an act authorized by public authority, it must appear that the public injury was the necessary or probable result of the permitted

act, when performed with the utmost care to prevent injurious results. *Wood on Nuisances Chap. 23 ; King* v. *M. & E. R. R. Co., 3 C. E. Gr. 397 ; State* v. *M. & E. R. R. Co., 1 Dutch. 437.*

Nor would I be considered as implying that if council had, under the authority actually vested in them, built a public sewer discharging in a thickly-settled part of the city and there creating a nuisance, indictments would not lie or injunctions would not issue to punish those who maintained the nuisance or to restrain its continuance. When that case arises, it will be necessary to decide whether authority to construct public sewers includes authority to create a nuisance.

The next objection made by appellants questions relator's right to file this bill in the name of the state.

When the ground on which a nuisance is attacked is the injury to the public, the ordinary and proper remedy is doubtless by bill or information on the part of the attorney-general. *Wood on Nuisances § 811 ; Attorney-General* v. *D. & B. B. R. R. Co., 12 C. E. Gr. 1.*

Relators properly admit that their right to institute this proceeding must be derived from statute. They claim to have such right under an act entitled, " Supplement to an act entitled, ' An act relating to local boards of health,' approved March 22d, 1881," which supplement was approved March 22d, 1883. *P. L. of 1883 p. 119.* By the tenth section of this act, power is given to certain local boards of health to file a bill in equity as relators in the name of the state, for an injunction to prohibit the continuance of nuisances hazardous to public health. Relators insist that they are within the provisions of this section.

This insistment requires us to determine the *status* of relators, and incidentally to examine various acts on the subject of the protection of the public health.

By the charter of Trenton, heretofore referred to, the common council was empowered to establish a board of health, to define its powers and duties, and to provide for the protection and maintenance of the health of the city. *P. L. of 1874 p. 344 § 25 pl. XXII.*

Under this power a board of health was organized and established, and such a board was in existence in 1880.

By the "Act concerning the protection of the public health and the record of vital facts and statistics relating thereto," approved March 11th, 1880 (*P. L. of 1880 p. 206*), it was enacted that every city, borough, incorporated town, or a town governed by a commission, should have a board of health, to be organized in the manner set out in the act. By a proviso contained in the eleventh section, the act was, however, excluded from operating on boards of health then organized in any city under its charter. The act was, therefore, not operative in the city of Trenton.

The obvious intent of this legislation was to provide for a health board in every municipality; where such boards were already organized, they were left to act under their respective charters. But where no such boards existed, the act required them to be created.

The next act to be considered was entitled "An act relating to local boards of health," and was approved March 22d, 1881. *P. L. of 1881 p. 160.*

The second section of this act is expressed in language which is most unfortunately obscure and ungrammatical, but it may, in my judgment, be construed as enacting that any board of health organized in any city under the provisions of its charter may, by the order and direction of the mayor and common council of such city, be organized in accordance with the provisions of the act of 1880.

The plain intent of the section is to give authority to those cities in which the act of 1880 was not operative, to organize their boards of health in the manner prescribed by that act.

But it is insisted that, in this respect, the legislature has failed to effectuate its design, and that the act, or at least the section in question, is unconstitutional.

It is said that the title of the act does not express the object aimed at in this section. But it is sufficient if the object is, by fair intendment, included within the title. *Walker* v. *Union, 4 Vr. 350; Snipe* v. *Shriner, 15 Vr. 206; Payne* v. *Mahon, 15 Vr. 213.* Legislation respecting local boards of health would

fairly include legislation respecting the organization of such boards.

It is further urged that this section amends the act of 1880, and so becomes obnoxious to the constitutional prohibition against revising or amending any act by reference to its title only. But, while this act incidentally extends the operation of the act of 1880, it is not amendatory legislation within the meaning of this constitutional prohibition. The section in question does not amend the act of 1880 in terms, or by implication. Its effect upon that act is not direct, but incidental, and such legislation is not prohibited. This view of this clause of the constitution has been taken in the supreme court in *Van Riper* v. *Parsons, 11 Vr. 123 ; Evernham* v. *Hulit, 16 Vr. 53,* and in *Campbell* v. *Board, 16 Vr. 241.* The last case has, at this term, been approved by this court.

These are the only constitutional objections to the act of 1881 which have been urged upon us. No other objections were made, or have been considered.

The act, therefore, not being objectionable on those grounds, must be considered as giving opportunity to the city of Trenton to organize its board of health in accordance with the act of 1880.

By an ordinance of the common council, approved by the mayor on July 12th, 1882, it was ordained that a board of health should be organized under the act of 1880. The ordinance repealed the ordinance establishing a board of health under the charter.

Under this ordinance relators were organized, and have since acted as the board of health of the city.

Appellants further urged that the organization is not such as the act of 1880 required.

If the board has been organized, and is in existence *de facto* under this act, I apprehend that this objection could not be considered. Their title to office could no more be contested in this proceeding than could the title of an attorney-general, acting in his office, upon an information filed by him.

But examination shows that the ordinance does provide for an

organization in accordance with the act of 1880. It prescribes the number of members, and the mode of appointment, as the act requires. It directs that one city physician and one health inspector shall be members, and the act requires them to be members if there are such officers in the city. It prescribes a term of service, within the act, for all the members, except the physician and inspector. It fixes the term of those members at the term of their respective offices. It is in this respect that the ordinance is attacked, and it is contended that these members are required, by the act of 1880, to hold office for at least three years. But this is not, in my judgment, the true meaning of that act. When it requires existing officials to be members of the board, it implies, of necessity, that they are to be members during their official term. The prescription of the act respecting the term of members of the board, is manifestly to be limited to such members as are not such *ex officio*.

Having reached the conclusion that this board was properly organized under the act of 1880, it follows that they have power to initiate this proceeding. The ninth section of the act of 1883, above referred to, provides that any board of health so organized may inquire into the existence of nuisances hazardous to public health, and the tenth section provides that any *such* board may file a bill in the court of chancery, in the name of the state, for an injunction to prohibit the continuance of such nuisances.

It was further urged that the court below erred in not receiving pertinent evidence offered to show that the discharge of the waste from this hotel through the sewer complained of, occasioned less hazard to health than any other practicable method of disposing of it, until the city of Trenton built public sewers, into which it could be discharged.

The argument was that hotels are public necessities, and as such, licensed to entertain guests; that the waste matter from every human being tended to create a nuisance; that when many were collected, the disposal of such waste was necessarily at the risk of creating a nuisance, and that a court of equity would not enjoin one method of disposal of such waste, if shown that other practicable modes were more injurious.

But this contention cannot prevail, and the evidence offered was rightly rejected. No business is so necessary as to justify those conducting it in creating a nuisance within the thickly-settled parts of a city. If a hotel cannot dispose of its necessarily accumulating filth without creating a nuisance, and happens to be erected in a populous city which will not or cannot provide sewers or other facilities for disposing of such filth without injury, it is plain that its business must cease in that locality until it can be conducted with due regard to public safety and comfort.

The decree below should be affirmed, with costs.

*Decree unanimously affirmed.*